**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROBERT REED, STACEY COPPOCK, CRAIG MORFORD, KELLI MORFORD, and DAVID SCHIAVI, individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>    v.<br><br>FORD MOTOR COMPANY,<br><br>         Defendant. | Civil Action No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

1.     Plaintiff(s) Robert Reed, Stacey Coppock, Craig Morford, Kelli Morford, and David Schiavi ("Plaintiff(s)") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2013-2019 Ford Escapes, 2013-2019 Ford Fusions, 2015-2018 Ford Edges, 2017-2019 Lincoln MKC's, and 2017-2019 Lincoln MKZ's equipped with 1.5L, 1.6L, or 2.0L "Ecoboost" engines (the "Ecoboost engines") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced by Ford Motor Company ("Ford" or "Defendant"). ("Class Vehicles"). Plaintiff(s) allege(s) as follows:

**<u>INTRODUCTION</u>**

2.     Though they vary in size, the Ecoboost engines in each of the Class Vehicles are substantially the same in their engineering and design in that they contain the same, or substantially similar, componentry and materials.

3.     The Ecoboost engines in the Class Vehicles suffer from a defect that causes their engine coolant to leak into the engine's cylinders (the "Engine Defect"). Engine coolant is essential to maintain the function and safety of the Ecoboost engines.  Leaking coolant causes overheating, can result in the cylinder head cracking, and, in some cases, can cause total engine

failures and engine fires, even at low mileage. Having coolant in the cylinders of the engine can also cause corrosion, oil dilution and contamination, and other engine damage.

4.     The Engine Defect is inherent in each of the Class Vehicles and is present at the time of sale.

5.     Even with extensive knowledge of the Engine Defect, Ford has nevertheless failed to provide any final solution to consumers who purchased or leased Class Vehicles. Further, Ford has not addressed the source of the defect for those consumers, including for those whose vehicles are still under warranty. In fact, Ford merely performs temporary stop-gap remedies such as installing coolant level sensors. This sensor, while intended to alert consumers when their coolant has been depleted so it can be refilled, the sensor does not prevent the Ecoboost engines from further coolant depletion.  More importantly, the sensor does nothing to prevent the coolant from leaking into the engine cylinders. Ford may otherwise simply perform ineffective replacement of certain parts, thereby never actually addressing the cause of the Engine Defect.

6.     When a consumer's Ecoboost engine overheats or fails after expiration of their vehicle's warranty, the consumer must pay out-of-pocket for the necessary repairs and, may still have to return for repeated service visits. These repairs, including a full engine replacement, can total thousands of dollars.

7.     The Ecoboost Defect prevents Plaintiffs' and Class Members' ability to have safe, comfortable, and expected use of their Class Vehicles and leaves the Class Vehicles incapable of providing safe, reliable transportation. The Ecoboost Defect exposes Plaintiffs and Class Members to severe risks created by engine failures and engine fires and requires paying for exorbitant repairs and/or engine replacement.

8.     Based on pre-production testing, including design failure mode analysis, early warranty claims, replacement part orders, and consumer complaints to Ford's authorized network of dealers, as well complaints to NHTSA, Ford were aware of the Engine Defect in the Class Vehicles as early as 2010.  Despite being aware of the defect and numerous complaints,

2

Ford knowingly, actively and affirmatively omitted and concealed the existence of the Engine Defect in advertising and manuals to increase profits by selling additional Class Vehicles at inflated prices.

9.      If Plaintiffs and Class Members had known about the Engine Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

10.     As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' are defective, that they overpaid for defective vehicles, and that the Class Vehicles' Ecoboost engines increase their chances of being involved in a collision by overheating, catching fire, or catastrophically failing.

## THE PARTIES

### Plaintiff Robert Reed

11.     Plaintiff Robert Reed is a Colorado citizen and resident.

12.     On or around March 29, 2018, Plaintiff Reed purchased a used 2016 Ford Edge with approximately 36,376 miles on the odometer from McCloskey Motors in Colorado Springs, Colorado.

13.     Plaintiff Reed purchased his 2016 Ford Edge primarily for personal, family, or household use.

14.     Passenger safety and reliability were important factors in Plaintiff Reed's decision to purchase his vehicle. Before making his purchase, Plaintiff Reed researched the 2016 Ford Edge online, viewed the vehicle's window sticker, and test drove the vehicle. Plaintiff Reed believed that the 2016 Ford Edge would be a safe and reliable vehicle.

15.     Ford's omissions were material to Plaintiff Reed. Had Ford disclosed its knowledge of the Engine Defect before he purchased his 2016 Ford Edge, Plaintiff Reed would have seen and been aware of the disclosures. Furthermore, had he known of the Engine Defect, Plaintiff Reed would not have purchased his vehicle or would have paid less for his vehicle.

16.     In or around November 2020, with approximately 65,000 miles on the odometer, Plaintiff Reed began to experience the Engine Defect.  On or around November 5, 2020, the engine light illuminated, causing Plaintiff to deliver his vehicle to Meining Automotive, a repair entity in Longmont, Colorado.  The technician "SCAN[NED] COMPUTER FOR TROUBLE CODES-P0303, P0316 (MISFIRES)" and noted, "ENGINE COOLANT WAS ALSO LOW." The repair order further noted, "test fuel and ignition systems for misfires. Perform block test, and pressure test cooling system to inspect for possible coolant in cylinders. Coolant is leaking into cylinder #3 and block test indicates combustion gases in cooling system. Long block assembly may need to be replaced per Ford service bulletin." The Meining Automotive technician Further advised Plaintiff Reed to take his vehicle to a Ford service entity. Plaintiff Reed paid $189.00 for Meining Automotive's diagnosis of the vehicle.

17.     Thereafter, on or around November 13, 2020, Plaintiff Reed took his vehicle to Longmont Ford, an authorized Ford service entity in Longmont, Colorado, where the technician advised that the engine needed to be replaced. The technician initially estimated that the engine would cost approximately $10,000 to replace. After Plaintiff Reed advised he intended to consider alternatives to replacing the engine, such as getting rid of the vehicle, the technician provided a lower replacement cost of $7,178.62.

18.     Plaintiff Reed contacted Ford's corporate customer service department, requesting reimbursement or a discount for the replacement of his vehicle's engine, but Ford refused to cover any of the cost.

19.     Plaintiff Reed's vehicle has not yet been repaired and continues to be defective.

20.     At all times, Plaintiff Reed, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

4

**Plaintiff Stacey Coppock**

21.     Plaintiff Stacey Coppock is a Michigan citizen and resident.

22.     On September 6, 2017 Plaintiff Coppock purchased a new 2017 Ford Edge from Brighton Ford in Brighton, Michigan. Brighton Ford is one of many Ford-authorized Michigan dealerships.

23.     Plaintiff Coppock purchased her 2017 Ford Edge primarily for personal, family, or household use.

24.     Passenger safety and reliability were important factors in Plaintiff Coppock's decision to purchase her vehicle. Before making her purchase, Plaintiff Coppock spent approximately two weeks researching and comparing the 2017 Ford Edge and visiting dealer websites. Plaintiff Coppock reviewed the window sticker, vehicle information sheet and vehicle information brochure, and spoke with a salesperson at the dealership regarding the 2017 Ford Edge and went on a test drive of the vehicle. Plaintiff Coppock believed that the 2017 Ford Edge would be a safe and reliable vehicle.

25.     Ford's omissions were material to Plaintiff Coppock. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Edge, Plaintiff Coppock would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Coppock would not have purchased her vehicle or would have paid less for her vehicle.

26.     In or around October 8, 2019, with approximately 64,041 miles on the odometer, Plaintiff Coppock began to experience the Engine Defect.  On that date, Plaintiff Coppock delivered her vehicle to Brighton Ford complaining that her engine light was illuminated, and that the vehicle had a coolant smell. The technician found that diagnostic trouble codes P0301, P0012, and P0217, confirmed that the D8 Block was cracked in cylinder number 1, and low coolant levels. The technician "VERIFIED CHECK ENGINE LIGHT IS ON DTC P0012, P0217, P0301 AND LOW COOLANT ADD AND PRESSURE TESTED COOLING SYSTEM LOOSING (sp) 4PSI AFTER 5HRS REMOVED SPARK PLUG FOUND COOLANT NO1 CYLINDER WITH BORE

SCOPE. FOUND TSB 19-2346. REMOVED ENGINE AND REPLACED LONG BLOCK ENGINE AND ALL GASKET FITTING LINES BOLTES PER TSB AND WORSHOP MANUAL, RE-ASSEMBLED INSTALLED AND CLAR DTC RESET MISFIRE PROFILE AND ROAD TESTED AND RETESTED PASSED." Plaintiff Coppock was forced to pay $3,314.00 for the repair.

27.     At all times, Plaintiff Coppock, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiffs Craig and Kelly Morford**

28.     Plaintiffs Craig and Kelly Morford are Missouri citizens and residents.

29.     On April 18, 2017, the Morfords purchased a new 2017 Ford Escape from Shawnee Mission Ford in Shawnee, Kansas. Shawnee Mission Ford is one of many Ford-authorized Kansas dealerships.

30.     The Morfords purchased their 2017 Ford Escape primarily for personal, family, or household use.

31.     Passenger safety and reliability were important factors in the Morfords' decision to purchase their vehicle. Before making their purchase, the Morfords spent four months researching the 2017 Ford Escape and comparing it to other vehicles including visiting Ford's website. They viewed commercials and advertisements, reviewed brochures and the window sticker, spoke with a salesperson at the dealership regarding the 2017 Ford Escape, and went on a test drive with the dealership salesperson. The Morfords believed that the 2017 Ford Escape would be a safe and reliable vehicle.

32.     Ford's omissions were material to the Morfords. Had Ford disclosed its knowledge of the Engine Defect before they purchased their 2017 Ford Escape, the Morfords would have seen and been aware of the disclosures. Furthermore, had they known of the Engine Defect, the Morfords would not have purchased their vehicle or would have paid less for their vehicle.

33.     In or around October of 2020, with approximately 66,331 miles on the odometer, the Morfords began to experience the Engine Defect.  The car would idle rough and seem to misfire

while driving.  Plaintiff Craig Morford delivered their vehicle to Bob Sight Auto Group, an authorized Ford repair facility. He complained that his vehicle's check engine light was illuminated and that the vehicle seemed to shake at idle. The technician "RAN ON IDS. P0302, P0316 IN SYSTEM, COOLANT LEVEL LOW, PRESSURE TEST SYSTEM. REMOVE SPARK PLUG AND INSPECT CYLINDERS FOR COOLANT. FOUND COOLANT LEAKING INTO CYLINDER."

34.     Plaintiff Craig Morford was informed that he would have to pay $5,950.00 to "REPLACE LONG BLOCK DUE TO COOLANT INRUSTION INTO CYLINDER #2." He was charged $100.00 for the diagnosis. The Morfords' vehicle has never been repaired, or replaced, and continues to be defective.

35.     At all times, the Morfords, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff David Schiavi**

36.     Plaintiff David Schiavi is a New Jersey citizen and resident.

37.     On July 29, 2015, Plaintiff Schiavi purchased a new 2015 Ford Escape from Fullerton Ford in Somerville, NJ. Fullerton Ford is one of many Ford-authorized New Jersey dealerships.

38.     Plaintiff Schiavi purchased his 2015 Ford Escape primarily for personal, family, or household use.

39.     Passenger safety and reliability were important factors in Plaintiff Schiavi's decision to purchase his vehicle. Before making his purchase, Plaintiff Schiavi spent substantial time researching his vehicle. Plaintiff Schiavi did a general online search for information on the vehicle, watched television advertisements for the vehicle, reviewed the window sticker and documents provided at the dealership.  He also spoke with a salesperson at the dealership regarding the 2015 Ford Escape, who informed him that the Ecoboost was just as powerful and reliable as the six-cylinder engine in his prior Ford Escape, and went on a test drive with the dealership

salesperson. Plaintiff Schiavi believed that the 2015 Ford Escape would be a safe and reliable vehicle.

40.     Ford's omissions were material to Plaintiff Schiavi. Had Ford disclosed its knowledge of the Engine Defect before he purchased his 2015 Ford Escape, Plaintiff Schiavi would have seen and been aware of the disclosures. Furthermore, had he known of the Engine Defect, Plaintiff Schiavi would not have purchased his vehicle or would have paid less for his vehicle.

41.     In or around October 28, 2020, with approximately 55,265 miles on the odometer, Plaintiff Schiavi began to experience the Engine Defect.  He delivered his vehicle to Fullerton Ford complaining that the engine light was illuminated and that "ROUGH IDLE ADNLOSS OF HEAT ALL STARTED AT THE SAME TIME." The technician "Verified customer concern. Tch scanned vehicle for codes found P0303, P0316, and overtemp codes for cylinder head and coolant temp sensor. Tech found the degas bottle had little to no coolant present in the bottle. Tech toppf (sic) off the coolant, pressure tested the system but found no leaks. Tech then removed the spark plug on cylinder 3 and removed the spark plugs on the 2 adjacent cylinders. Tech pressure tested the cooling system over night to see if coolant was present in the cylinders. Tech came back the next day, used a bore scope on all 3 cylinders and found the pressure dropped from 25 psi to 20 psi and then cylinders had coolant present. Tech recommended a new engine along with all the hardware and gaskets recommend to be replaced when replacing the engine as per Ford. Customer declined work at this time." The dealership informed Plaintiff Schiavi he would need to pay to replace his engine and charged him $169.00 for diagnosing the vehicle. Plaintiff Schiavi's vehicle has never been repaired and continues to be defective.

42.     At all times, Plaintiff Schiavi, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**<u>Defendant</u>**

43.     Defendant Ford Motor Company is a Delaware limited liability company with its Corporate Headquarters located at 1 American Road, Dearborn, Michigan 48126. Ford Motor

Company is registered to do business in the State of Delaware.  Ford Motor Company designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world.  Ford Motor Company is the warrantor and distributor of the Class Vehicles in California and throughout the United States

44.	At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

45.	In order to sell vehicles to the general public, Defendant enters into agreements with dealerships who are then authorized to sell its branded vehicles such as Fords and Lincolns to consumers such as Plaintiffs.  In return for the exclusive right to sell new Ford and/or Lincoln vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers.  These contracts give Defendant a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles.  All service and repair at an authorized dealership are also completed according to Defendant's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents.  Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiffs can receive services under Defendant's issued warranties at dealer locations that are convenient to them.

46.	Defendant also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.  Defendant is also responsible for the production and content of the information on the Moroney Stickers.

47.	Defendant is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant.  Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

## JURISDICTION AND VENUE

48.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than Ford, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

49.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

50.     This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as Ford is "at home" in Delaware.

51.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue Ford in this District, Ford's state of incorporation.

## FACTUAL ALLEGATIONS

52.     For years, Ford has designed, manufactured, distributed, sold, leased and warranted the Class Vehicles. In 2019, Ford's North American automotive segment generated revenue from its sales of vehicles, parts, and accessories totaling $98,053,000 with a market share of 13.2%.[1]

53.     Ford marketed and sold thousands of Class Vehicles nationwide, including through its nationwide network of authorized dealers and service providers. Ford sells its vehicles to its

---

[1] *See* Ford Motor Company 2019 Annual Report (Form 10-K), at 27, 33 (Feb. 5, 2020), available at https://s23.q4cdn.com/799033206/files/doc_financials/quarterly/2019/q4/10k-2019-q4.pdf (last accessed November 30, 2020).

authorized dealerships, which in turn sell those vehicles to consumers. After these dealerships sell cars to consumers, including Plaintiffs and Class Members, they purchase additional vehicle inventory from Ford to replace the vehicles sold, increasing Ford's revenues. Thus, Plaintiffs' and Class Members' purchase of Class Vehicles accrues to the benefit of Ford by increasing its revenues.

54.     In 2009, Ford began producing gasoline-fueled, turbocharged, direct-injection (also called "GTDI") engines they called "Ecoboost". These Ecoboost engines are marketed as providing a low-emissions, fuel-efficient alternative to hybrid or electric vehicles.

55.     Shortly after release however, Ford discovered that Ecoboost engines in Class Vehicles are predisposed to leak coolant, allowing coolant to invade the engine cylinder, causing the engines in the Class Vehicles to overheat and ultimately causing engine fires and/or total engine failure. The Engine Defect compromises the comfort, safety, and enjoyment of the Class Vehicles, and requires owners to pay out-of-pocket to temporarily address the problem and/or replace the defective Ecoboost engine with an equally defective engine, leaving them susceptible to repeated failures like those experienced by Plaintiffs.

**The Engine Defect**

56.     On information and belief, Engine Defect results from the design and/or poor manufacturing of the engine block and cylinder head, including use of an inadequate seal on the cylinder head. This design includes grooves at the point where the engine's cylinder head attaches to the engine block, as seen below, circled in yellow for clarity:



57.    In a typical – not defective – engine, liquid coolant is used to prevent the engine from overheating. The coolant travels through a defined path through the engine block and cylinder head thereby cooling the engine. The liquid absorbs transferred heat due to contact with the engine and then flows through a hose and into the radiator to cool itself down. Once the temperature of the coolant has lowered, the coolant re-circulates through the engine, and continuing the cycle.

58.    In the Class Vehicles, however, the coolant leaches through the grooves present on the cylinder head where it pools as it travels through the engine. The pools of coolant pooling degrade the engine's gasket seals, eventually resulting in the coolant leaking into the engine's cylinders. The degraded seals can be seen below:



59.     The coolant leaks cause two related problems. First, due to the leaking, insufficient coolant remains in the engine to properly cool it, which results in the engine overheating. The engine overheating can then cause catastrophic damage, including cracked cylinder heads from the excessive heat.  Engine overheating can also warp other internal components, such as pistons. In addition, when an overheated engine reaches a certain degree, the overheating causes a loss of oil viscosity, which may lead to complete engine seizure, and in some instances, engine fire.

60.     Second, coolant leaking into cylinders can cause the engine to misfire. Coolant in the cylinders is burned through the combustion chamber and exits through the vehicle's exhaust, which in some instances causes smoke to emit from the vehicles' exhaust. Additionally, coolant that enters the cylinders can mix with the oil on the cylinder walls, causing oil dilution and/or contamination, which in turn causes corrosion and excessive wear on bearings and other internal engine surfaces.

61.     These failure modes can occur at low mileage and can cause catastrophic failure within warranty.

62.     Ford's short-term and ultimately ineffectual repair measures, such as installing low coolant sensors and/or the replacement of defective Ecoboost engines with equally defective replacement engines, render Class Vehicles susceptible to repeat failures.

63.     On information and belief, Ford has developed a feasible alternative design for an Ecoboost engine that does suffer from the Engine Defect but has not replaced the defective Ecoboost engines installed in Class Vehicles, leaving Class Members to face repeated engine failure.  In particular, the long block of the engine has been redesigned to remove a particular "cut" that exists in the engines of Class Vehicles.

64.     The alleged Engine Defect was inherent in each Class Vehicles and was present in each Class Vehicle at the time of sale.

65.     Ford knew about the Engine Defect present in every Class Vehicle, along with the attendant safety problems, and concealed this information from Plaintiffs and Class Members at

the time of sale, lease, repair, and thereafter. In fact, instead of repairing the Class Vehicles, Ford has insisted that the vehicles are working as designed.

66.     If Plaintiffs and Class Members had known about the Ecoboost Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

67.     As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles' are defective, that they overpaid for defective vehicles, and that the Class Vehicles' Ecoboost engines increase their chances of being involved in a collision by overheating, catching fire or catastrophically failing.

**Ford Had Superior and Exclusive Knowledge of the Engine Defect**

68.     On information and belief, Ford became aware of the Engine Defect at least as early as 2010, well before Plaintiffs and Class Members purchased their Class Vehicles. Ford learned of the defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer complaints made to Ford and/or NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

69.     While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive and exclusive knowledge about the Ecoboost engines installed in those Vehicles. In particular, Ford would have an understanding of the functionality of standard engine systems, such as coolant flow, and the compatibility of the engine materials with necessary chemicals, such as coolant and antifreeze.

70.     Adequate pre-release analysis of the design, engineering, and manufacture of the Ecoboost engines in the Class Vehicles would have revealed to Ford that the design of the engine was defective and susceptible to leaking coolant into the cylinders.

**NHTSA Complaints**

71.      Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

72.      Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related, such as spontaneous engine fires.

73.      Many Class Vehicle owners and lessees submitted complaints about the Engine Defect with NHTSA's Office of Defect Investigations ("ODI").

74.      From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about Engine Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford that the Engine Defect is widespread, and a safety hazard.

75.      The following are 5concerning the Engine Defect, available through NHTSA's website, www.safercar.gov, which reveal that Ford, through its network of dealers and repair technicians, was made aware of many engine failures.

a.   NHTSA ID Number: 10480692, Incident Date October 21, 2011, Consumer Location ROANOKE, VA, Vehicle Identification Number 1FMCU0HX0DU****:

MY 2013 FORD ESCAPE, 1.6 LITER ENGINE, HAD 3 RECALLS, (TWO WERE ENGINE FIRE RELATED). ALL 3 RECALL REPAIRS WERE DONE BY THE LOCAL FORD DEALER, SALEM, VA. WE PICKED VEHICLE UP AFTER THIRD RECALL WORK HAD BEEN DONE ON 9/17/12. WE ASSUMED THE RECALL WORK WAS DONE CORRECTLY, AND THAT FORD'S "FIX" WORKED CORRECTLY. ON 9/21/12 WE WERE TRAVELING EAST AT 65 MPH IN THE RIGHT LANE ON I-64 NEAR CHARLOTTESVILLE, VA. IT WAS ABOUT 1 PM

IN THE AFTERNOON. THERE WAS A "POP" SOUND IN THE ENGINE AREA. INSTANTLY, THE ACCELERATOR HAD NO RESPONSE, THE HIGH ENGINE TEMPERATURE WARNING LIGHT CAME ON, AND THEN ALL WARNING LIGHTS, GAUGES, & TACHOMETER ALL WENT DEAD. LUCKILY, WE WERE ADJACENT TO AN EXIT RAMP, AND WE COASTED TO A STOP ON RTE 20/53. IMMEDIATELY, WHITE STEAM CAME OUT OF THE ENGINE COMPARTMENT. KNOWING THE THIRD RECALL DEALT WITH THE "RISK OF ENGINE FIRES", WE GOT OUT, AND MOVED WELL AWAY FROM THE VEHICLE. WITHIN MINUTES, BROWN, OILY SMOKE CAME OUT FROM UNDER THE HOOD. THEN FLAMES CAME OUT FROM UNDER THE HOOD, AT THE WINDSHIELD AND OUT THE SIDES OF THE ENGINE COMPARTMENT. THEN THE CAR BURST INTO FLAMES AND WAS DESTROYED. PICTURES WERE TAKEN OF THE VEHICLE ON FIRE, AND AFTER IT WAS OUT, WITH A CELL PHONE. AFTER THE FIRE WAS OUT, THE VEHICLE WAS TAKEN TO THE FORD DEALER IN CHARLOTTESVILLE, VA..

WE WERE TOLD THE INSURANCE COMPANY HAD RETAINED A FIRE INSPECTOR TO LOOK AT THE CAR, AND ASK ME QUESTIONS, WHICH HE DID. LATER THE INSPECTOR SAID THE INSURANCE COMPANY DID NOT REQUIRE A REPORT.

b.  NHTSA   ID   Number: 10513837,   Incident   Date May   22,   2013   Consumer

Location CYPRESS, TX, Vehicle Identification Number 1FMCU0HX3DU****

WAS DRIVING DOING 40MPH WHEN OUT OF NO WHERE I RECEIVED A MESSAGE INSTRUCTING ME TO IMMEDIATELY PULL VEHICLE OVER AND SHUT        DOWN        DUE        TO        ENGINE        OVERHEATING.

NEVER RECEIVED A "LOW COOLANT" LIGHT, JUST A SUDDEN WARNING TO PULL OVER. HAD TO BE TOWED FROM THE INCIDENT. LUCKILY NO ONE WAS INJURED AND THERE WERE NO ACCIDENTS AS IT WAS A TWO LANE, ONE WAY, STREET WITH NO SHOULDERS. OPENED THE HOOD AND I HAD ABSOLUTELY NO ENGINE COOLANT. ALSO NOTICED THAT THE ENGINE WAS IN FACT VERY HOT. I AM CONCERNED THAT THIS HAS CAUSED ENGINE DAMAGE ON MY BRAND NEW VEHICLE.

c.  NHTSA   ID   Number: 10521995,   Incident   Date June   22,   2013,   Consumer

Location PALO ALTO, CA, Vehicle Identification Number 1FMCU9GX2DU****

MY CAR HAS OVERHEATED TWICE AFTER THE RECALL FIX. MY COOLANT WAS VIOLENTLY BOILING OVER. MY TRANSMISSION IS ALSO GROSSLY SHIFTING INCORRECTLY. I ALMOST GOT HIT BY ANOTHER CAR WHEN I WAS TRYING TO MERGE ONTO THE FREEWAY SINCE IT WASN'T GOING TO THE NEXT GEAR. THE TRANSMISSION REDLINED AND THEN SHIFTED. I CHECKED MY OBT AND I'M NOT GETTING ANY CODES FOR THESE                                                         PROBLEMS.

I'M NOT SURE WHAT TO DO ANYMORE SINCE ANYTIME I'VE BROUGHT MY CAR IN THEY HAVEN'T FOUND ANY ISSUES. I'VE BROUGHT MY CAR IN SEVERAL TIMES ABOUT THE ENGINE AND TRANSMISSION AND NO ISSUES HAVE BEEN FOUND. I DRIVE THROUGH THE SANTA CRUZ MOUNTAINS EVERY WEEK AND I'M AFRAID ONE DAY MY ENGINE WILL CATCH ON FIRE (HILLY ROADS AND LOW SPEEDS CAUSE THE ENGINE TO RUN HOT). IT WOULD BE DISASTROUS FOR THE STATE OF CALIFORNIA IF A WILDFIRE WAS STARTED DUE TO THIS CAR.

d.  NHTSA ID Number: 10552925, Incident Date November 18, 2013, Consumer

Location PALO ALTO, CA, Vehicle Identification Number 1FMCU9GX2DU****

MY CAR IS STILL OVERHEATING AFTER BRINGING IT INTO THE DEALER 6 TIMES. THEY HAVE DONE THE RECALL FIX TWICE NOW. THERE APPEARS TO BE SMOKE COMING OUT OF MY HOOD NOW WITH A BURNT SMELL. THE BURNING AND COOLANT SMELL IS TRIGGERING MY ASTHMA WHILE DRIVING.

e.  NHTSA ID Number: 10959479, Incident Date January 1, 2017, Consumer

Location CENTRAL ISLIP, NY, Vehicle Identification Number 1FMCU9GX1EU****

ON MANY DIFFERENT TIMES MY CAR OVER HEATS. I IMMEDIATELY HAVE TO PARK N WAIT A WHILE FOR IT TO COOL DOWN.

f.  NHTSA ID Number: 10993089, Incident Date March 20, 2017, Consumer

Location ALMA, AR, Vehicle Identification Number N/A

IT KEEPS SHOWING THAT THE SUV IS OVERHEATING WITH A WARNING. IT WILL PASS AFTER A FEW MINUTES. IT HAS HAPPENED AT LEAST 6 TIMES. WR HAVE LESS THEN 35,000 MILES ON THE CAR

g.  NHTSA ID Number: 10984996, Incident Date May 8, 2017, Consumer

Location ARCANUM, OH, Vehicle Identification Number 1FMCU9GX7EU****

RECEIVED RECALL 17S09 ONE WEEK STATING LOSS OF COOLANT COULD CAUSE CYLINDER HEAD TO CRACK AND OIL TO LEAK OUT ONTO EXHAUST MANIFOLD AND CATCH FIRE. THE VERY NEXT WEEK WHILE DRIVING ON A COUNTRY ROAD MY ESCAPE CAUGHT FIRE WHILE DRIVING. I WAS LUCKY TO HAVE DRINKS IN THE CAR TO BE ABLE TO GET THE FIRE OUT BEFORE THE FIRE DEPARTMENT GOT THERE. TOWED VEHICLE TO FORD SHOP AND CONTACTED FORD CUSTOMER CARE KNOWING THAT THEY ARE AWARE OF THIS PROBLEM AND THEY WILL NOT ASSIST ME IN REPAIRING VEHICLE. THE RECALL BASICALLY ONLY

17

STATES ADDING A LOW COOLANT SENSOR WHICH IN REALLY WILL NOT HELP BECAUSE IF IT BECOMES LOW ON COOLANT THE HEAD IS ALREADY CRACKED AND DAMAGE IS ALREADY DONE. FURTHER MORE FORD KNOWING THEY HAVE THIS PROBLEM DOESN'T EVEN HAVE PARTS AVAILABLE UNTIL AT THE EARLIEST FALL OF 2017 SO MORE PEOPLE WILL BE HAVING CAR FIRES AND MAY NOT BE AS LUCKY AS I WAS TO WRITE THIS REPORT.

h.  NHTSA ID Number: 11002119, Incident Date June 28, 2017, Consumer

Location WATERFORD, WI, Vehicle Identification Number 1FMCU9GX8EU****

TL* THE CONTACT OWNED A 2014 FORD ESCAPE. WHILE DRIVING APPROXIMATELY 55 MPH, FLAMES ERUPTED UNDERNEATH THE VEHICLE AND UNDER THE HOOD. THE VEHICLE WAS COASTED TO THE SIDE OF THE ROAD. THE DRIVER NOTICED FLAMES COMING FROM UNDER THE HOOD AND FROM THE ENGINE COMPARTMENT. THE FRONT OF THE VEHICLE BURST INTO FLAMES. THE FIRE DEPARTMENT EXTINGUISHED THE FIRE. A POLICE REPORT WAS FILED. THE VEHICLE WAS DESTROYED AND TOWED TO WATERFORD TOWING LOT. THE VIN WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 17V209000 (ENGINE AND ENGINE COOLING). THE MANUFACTURER AND THE DEALER WERE NOT MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 65,000. THE VIN WAS NOT AVAILABLE. *LN *TR

i.  NHTSA ID Number: 11111995, Incident Date July 15, 2018, Consumer

Location HAGERSTOWN, MD, Vehicle Identification Number 1FMCU9JX3FU****

VEHICLE IS EXPERIENCING SIMILAR PROBLEMS WITH PREVIOUSLY RECALLED FORD ESCAPES FROM 2015. CHECK ENGINE LIGHT HAS GONE ON WITH THE CODE TO "REPLACE COOLANT BYPASS VALVE"

j.  NHTSA ID Number: 11205720, Incident Date May 5, 2019, Consumer Location INDIANAPOLIS, IN, Vehicle Identification Number 1FMCU9GX0FU**** TL* THE CONTACT OWNS A 2015 FORD ESCAPE. WHILE DRIVING 45 MPH, THE VEHICLE BEGAN TO OVERHEAT AS THE IDLE AND COOLER TEMP WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO TOM WOOD FORD (LOCATED AT 3130 E 96TH ST, INDIANAPOLIS, IN 4624, (317) 846-4241) WHERE IT WAS DIAGNOSED THAT COOLANT FUEL NEEDED TO BE ADDED. THE MANUFACTURER WAS NOTIFIED AND PROVIDED CASE NUMBER: CAS-21644009. THE FAILURE MILEAGE WAS 78,000

k.  NHTSA ID Number: 10549427, Incident Date October 23, 2013, Consumer

Location KEARNEY, MO, Vehicle Identification Number 3FA6P0HR1DR****

I WAS DRIVING MY 2013 1.6 LITER FORD FUSION ON 10/23/2013 AND THE ENGINE OVERHEATED. MY VEHICLE HAD TO BE TOWED TO THE DEALERSHIP. I LOOKED UP MY VIN NUMBER ON FORD BECAUSE AFTER THIS ALL HAPPENED I HEARD ABOUT FUSIONS BEING RECALLED FOR THIS SAME PROBLEM. ACCORDING TO FORD MY VIN NUMBER MY WAS NOT UNDER THE RECALLED FORD FUSIONS THAT HAD THE OVERHEATING PROBLEM. THE DEALERSHIP SAID THAT THE COOLANT HAD LEAKED INTO THE ENGINE AND HAD CAUSED IT TO OVERHEAT. THIS SOUNDS EXACTLY LIKE THE RECALL TO ME. I HAD NO IDEA ABOUT THE RECALL UNTIL AFTER THIS HAPPEN TO ME SO I DIDN'T GET OUT OF MY CAR. MY CAR COULD OF HAD AN ENGINE FIRE LIKE SOME OF THE RECALLED ONES HAVE HAD. I AM VERY UPSET WITH FORD. I BELIEVE THAT THEY STILL HAVE A PROBLEM AND MORE FUSIONS NEED TO BE RECALLED. IT IS SAD THAT FORD IS SELLING THESE CARS TO PEOPLE AND THEY COULD STILL BE UNSAFE.

l.  NHTSA ID Number: 10639009, Incident Date September 22, 2014, Consumer

Location WEST PALM BEACH, FL, Vehicle Identification

Number 3FA6P0HR3DR****

TL* THE CONTACT OWNS A 2013 FORD FUSION. THE CONTACT STATED THAT WHILE DRIVING AT AN UNKNOWN SPEED, THE VEHICLE DECELERATED AND THE TEMPERATURE WARNING LIGHT ILLUMINATED. THE CONTACT MENTIONED THAT THE TEMPERATURE GAUGE WAS AT THE MAXIMUM HIGH. THE CONTACT WAS NOT INCLUDED IN RECALL NHTSA CAMPAIGN NUMBER: 12V551000 (ENGINE AND ENGINE COOLING). THE VEHICLE WAS TOWED TO A DEALER. THE TECHNICIAN DIAGNOSED THAT THE ENGINE NEEDED TO BE REPLACED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 7,755

m.  NHTSA ID Number: 10979800, Incident Date March 26, 2017, Consumer

Location CLEVELAND, TN, Vehicle Identification Number 3FA6P0HDXFR****

VEHICLE BEGAN TO OVERHEAT WHILE DRIVING ON INTERSTATE... WARNING LIGHT WOULD BLINK AND CAR WOULD GET EXTREMELY HOT...

COOLANT WAS LEAKING INTO THE ENGINE, INTERNAL LEAK, SO WARNING LIGHT WOULD APPEAR ABOUT EVERY 3 DAYS

VEHICLE HAS BEEN PROPERLY MAINTENANCE AND NOTHING DONE BY OWNER TO CAUSE ENGINE FAILURE

n.  NHTSA ID Number: 11051098, Incident Date November 28, 2017, Consumer Location COLUMBUS, OH, Vehicle Identification Number 1FA6P0HDXE5****

CAR SAYS IT'S IVERHEATING AND IT WAS STATIONARY FOR HOURS BEFORE.

o.  NHTSA ID Number: 11101736, Incident Date December 5, 2017, Consumer Location NEWTOWN, PA, Vehicle Identification Number 3FA6P0HR3DR****

L* THE CONTACT OWNS A 2013 FORD FUSION. THE CONTACT STATED THAT THERE WAS A COOLANT LEAK AND THE ENGINE KEPT OVERHEATING. THE DEALER (FRED BEANS FORD OF NEWTOWN, 10 N SYCAMORE ST, NEWTOWN, PA 18940, (215) 968-3806) INSTALLED A SENSOR AND REPLACED THE COOLANT RESERVOIR TANK; HOWEVER, THE REMEDY FAILED TO PROVIDE A PERMANENT SOLUTION. THE CONTACT STATED THAT THE VEHICLE STALLED AND THE COOLANT WARNING INDICATOR WAS STILL FLASHING. SEVERAL INDEPENDENT MECHANICS DIAGNOSED THE VEHICLE, BUT WAS UNABLE TO PROVIDE A SPECIFIC DIAGNOSIS. THE MANUFACTURER INDICATED THAT THERE WAS NO RECALL FOR THE VEHICLE AND ADVISED THE CONTACT TO TAKE THE VEHICLE BACK TO THE DEALER FOR SERVICING. THE FAILURE MILEAGE WAS NOT AVAILABLE.

67.    Ford had superior and exclusive knowledge of the Engine Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

68.    Plaintiffs are informed and believe and based thereon alleges that before Plaintiffs purchased their Class Vehicles, and since 2010, Ford knew about the Engine Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Ford and its dealers, testing conducted in response to those complaints, high failure rates and replacement part sales data, and other aggregate data from Ford dealers about the problem.

69.    Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, on incoming components, including the engines, to verify the parts are free from defect and align with Ford's

specifications.[2] Thus, Ford knew or should have known that the subject engine was defective and prone to put drivers in a dangerous position due to the inherent risk of the defect.

70.     Additionally, Ford should have learned of this widespread defect from the many reports received from dealerships and from customer complaints directly to Ford. Ford's customer relations department collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

71.     Defendant's warranty department similarly analyzes and collects data submitted by its dealerships in order to identify trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide Ford with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to Ford, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

72.     Upon information and belief, Ford service centers, independent repair shops, and consumers doing repairs themselves use Ford replacement parts that they order directly from Ford. Thus, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders, information which is also exclusively within Ford's control and unavailable to Plaintiffs without discovery. The ongoing high sales of replacement Ecoboost engines was certainly known to Ford, and should have alerted Ford that its engines were suffering from a defect, causing coolant loss, overheating, engine failure, and engine fires.

73.     The existence of the Engine Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle.  Had Plaintiffs and other Class Members known of the Engine Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

---

[2] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed September 11, 2017).

74.     On information and belief, the Engine Defect has been so prevalent and Ford and its authorized dealers unwilling to help, that owners of Class Vehicles have tried numerous repairs on their own, including but not limited to replacing engines with non-OEM engines, replacing batteries, adding new grounding wires, and/or adding additional heat shielding.

75.     Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's engine will function regardless of heat conditions, are safe, will function in a manner that will not pose a safety risk, and are free of defects. Plaintiffs and Class Members further reasonably expect that Ford will not sell or lease vehicles with known safety defects, such as the Engine Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Ford to fail to disclose the Engine Defect to them and to continually deny it.

**Technical Service Bulletins**

76.     Ford has issued multiple TSBs to address the Engine Defect.

a.     <u>3/30/2018 SSM 47204</u> - **Some *2015-2018 Fusion/MKZ/MKC/Escape/Edge* vehicles** equipped with a 2.0L EcoBoost engine may exhibit a runs rough condition with DTCs P0300, P0301, P0302, P0303, P0304 and/or P0316. **This may be due to coolant intrusion due to corrosion on the engine** block**.** To diagnose this concern, with the engine at normal operating temperature, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If the coolant pressure drops 27.57 kPa (4psi), remove the spark plugs and inspect for coolant in the cylinders. **If coolant is found in any of the cylinders, replace the engine long block assembly**. Follow normal prior approval process for your Dealership. However, follow the diagnostic repair procedure in this article to determine correct repair. For claiming, use causal part 6006 and applicable labor operations in Section 6 of the SLTS Manual.

b.     8/13/2018 SSM 47462 - 2015-2018 Edge, Fusion, Focus, MKZ, MKC, Escape vehicles equipped with a 2.0L EcoBoost engine may exhibit coolant consumption, white smoke and/or a runs rough condition. Refer to the extended coolant pressure test and checking for combustion gases in Workshop Manual (WSM), Section 303-03A. If internal

coolant loss is confirmed, further investigation of the head gasket interface is required. Carefully inspect the cylinder block and head for erosion, pitting, and flatness defects, primarily between the cylinder to cylinder bore bridges. If defects to the aluminum surface on the cylinder block and/or cylinder head are found, follow the cost cap tool for component replacement. Follow WSM, Section 303-01A for the repair procedures

c. 10/30/2018 SSM 47625 - Some 2014-2019 Fusion and 2017-2019 Escape vehicles equipped with a 1.5L Ecoboost engine may exhibit coolant consumption and white smoke concern. Follow the Cooling System Pressure Test procedure in Workshop Manual (WSM), Section 303-03, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If cooling system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed, further investigation of the head gasket interface is required. Carefully inspect cylinder block for erosion, pitting, and flatness. Defects will be between the engine block cylinders and cylinder bore bridges. If defects with the surface of the cylinder block and/or cylinder head are identified, follow WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to determine the most cost-effective repair.

d. 3/7/2019 SSM 47849 - Some 2014-2019 Fusion and 2017-2019 Escape equipped with 1.5L Ecoboost engine may exhibit coolant consumption and white smoke concern. Follow the Cooling System Pressure Test procedure in WSM, Section 303-03, pressurize the cooling system to 138kPa(20 psi0 and hold for 5 hours. If cooling system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed, further investigation of the engine block surface to head gasket interface is required. Carefully inspect engine block cylinders and cylinder bore bridges for erosion, pitting, and flatness. If defects with the cylinder block surface are identified, follow WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to

determine the most cost-effective repair. Ford has found that all returned cylinder heads pass inspection and may have been reused.

e.  12/11/2019 TSB 19-2375 - 2017-2019 Ford Escape; 2014-2019 Ford Fusion. This article supersedes TSB 19-2139 to update the production fix date. Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, replace the short block and head gasket.

f.  12/20/2019 TSB 19-2346 - 2015-2018 Ford Edge; 2017-2019 Ford Escape, Fusion; 2017-2019 Lincoln MKC, MKZ. Some 2015-2018 Edge and 2017-2019 Fusion/MKZ/Escape/MKC vehicles equipped with a 2.0L EcoBoost engine may exhibit a low coolant level, white exhaust smoke and/or a runs rough condition with or without an illuminated malfunction indicator lamp (MIL). Diagnostic trouble codes (DTCs) may include P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To correct the condition, follow the Service Procedure steps to replace the long block engine assembly.

g.  1/21/2020 19B37-S1 -2017-2019 Ford Escape, Ford Fusion.  Some of the affected vehicles may exhibit coolant intrusion into the cylinder bores. Customer symptoms include coolant loss, excessive tailpipe smoke, or illuminated malfunction indicator lights (MIL) due to engine misfire. Over time, this condition my damage the engine, requiring replacement of the engine short block.

h.  4/2/2020 TSB 20-2100 - Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a

24

1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

i.   5/6/2020 TSB 19B37-S3 – 2017-2019 Ford Fusion and Escape.  Some of the affected vehicles may exhibit coolant intrusion into the cylinder bores. Customer symptoms include coolant loss, excessive tailpipe smoke, or illuminated malfunction indicator lights (MIL) due to engine misfire. Over time, this condition may damage the engine, requiring replacement of the engine short block.

j.   7/10/2020 SSM 48991 – Some 2015-2020 F150/Edge/Fusion, 2016-2018 MKX, 2019-2020 Nautilus, and 2017-2020 Continental vehicles equipped with 2.7L EcoBoost engines may exhibit an illuminated malfunction indicator lamp (MIL) and/or Engine Coolant Over Temperature warning with diagnostic trouble codes (DTCs) P0116, P0117, P0118, P0119, P0128, P0217, P0330, P1026, P1299, and/or P130D. This may be due to the engine coolant temperature (ECT) sensor or knock sensor wiring harness. To correct the condition, replace the 12A648 ECT sensor and 12A699 knock sensor. Do not disconnect the ECT sensor from the knock sensor harness in case parts are called back for analysis. For claiming, use causal part 12A699 and applicable labor operations in Section 10 of the Service Labor Time Standards (SLTS) Manual.

**Ford Issued A Recall**

77.    On March 27, 2017, Ford issued a Recall – NHTSA Campaign Number 17V209000 – 2013-2015 Transit Connect vehicles equipped with 1.6L GTDI engines." The recall notice stated that, because of an insufficient coolant level, the "engine cylinder head may overheat, crack, and leak oil."

78.     The Recall, which was set to begin on January 5, 2018, provided for the installation of a coolant level sensor, free of charge. The sensor was intended to alert drivers, and vehicle owners/leasers when the coolant in the engine needs to be refilled.

79.     The Recall did not disclose the risk of engine fires or total engine failure, and it did nothing to prevent the continued coolant leaks, and therefore did not repair the Engine Defect.

80.     The Recall was inadequate because the Recall did not address the true source of the problem and did nothing to repair the Engine Defect. Secondly, it did not include the full range of Vehicles affected by the defect.

81.     The Recall applied only to 1.6L Ecoboost engines, though1.5L and 2.0L Ecoboost engines are designed with the same engine block design, are made from the same materials, and suffer from the same Engine Defect.

82.     Despite the numerous customer complaints reported to Ford and NHTSA, as detailed above, Ford has never expanded the Recall to all vehicle models and model years that suffer from the Engine Defect.

83.     In 2018, Ford supplemented the Recall. This supplement acknowledged the risk of engine fires, but again did not include 1.5L or 2.0L engines, did not apply to the full class of vehicles equipped with defective Ecoboost engines, and did not address the underlying defect. Rather, it identified the problem as "localized overheating of engine cylinders."

84.     Indeed, the supplement simply provided "enhancements to the engine cooling and control systems" and repairs to damage caused by cracked cylinder heads resulting from overheating. But, the supplement did not provide for replacement engines.

85.     Additionally, although the Recall provides that the coolant sensor installation and the specific repairs and "enhancements" will be completed at no cost, it does not call for reimbursement of any payments by consumer for having the Vehicles' coolant refilled, to replace failed engines, vehicles lost to engine fires, and it does not compensate consumers for the costs

and expenses associated with the time during which they are unable to use their vehicle as a result of the recurrent Engine Defect.

86.     The Recall, including the supplement, is insufficient to address the underlying Engine defect and does not come close to adequately and wholly compensating Plaintiffs and Class Members for the injuries caused by the Engine Defect and Ford's related acts and omissions.

**Ford Has Actively Concealed the Engine Defect**

87.     Despite its knowledge of the Engine Defect in the Class Vehicles, Ford actively concealed the existence and nature of the defect from Plaintiffs and Class Members.  Specifically, Ford failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a.  any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the engines;

b.  that the Class Vehicles, including engine, were not in good in working order, were defective, and were not fit for their intended purposes; and

c.  that the Class Vehicles and the engines were defective, despite the fact that Ford learned of such defects as early as 2010.

88.     As discussed above, Ford monitors its customers' discussions on online forums, and actively concealed the defect by denying the existence of a defect, claiming slow or weak starts are normal condition, and blaming the class members for the problems.

89.     When consumers present their Class Vehicles to an authorized Ford dealer for diagnosis and repair, Ford refuses to honor the warranty, telling the customers that the condition is normal or else providing ineffective and incomplete repairs.

90.     Accordingly, despite Ford's knowledge of the Engine Defect, Ford has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' engines, and other damaged components, once the time limitations have run on the bumper-to-bumper warranty.

**Ford Unjustly Retained Substantial Benefits**

91.     On information and belief, Plaintiffs allege that Ford unlawfully failed to disclose the alleged Engine Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

92.     Plaintiffs further allege that Ford thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles.

93.     As discussed above therefore, Plaintiffs allege that Ford unlawfully induced them to purchase his respective Class Vehicles by concealing and/or omitting a material fact (the Engine Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Engine Defect.

94.     Accordingly, Ford's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that did - and likely will continue to - deceive consumers, should be disgorged.

**<u>TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL</u>**

95.     Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Engine Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect.  Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

96.     Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles contained the Engine Defect and the corresponding safety risk.  As alleged herein, the existence of the Engine Defect was material to Plaintiffs and members of the Class at all relevant times.  Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

97.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality and grade of the Class Vehicles and to disclose the Engine Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Engine Defect in Class Vehicles.

98.     Defendant knowingly, actively and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

99.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

101.    The Classes are defined as:

**Nationwide Class:** All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**Colorado Sub-Class:** All individuals who purchased or leased any Class Vehicle in the State of Colorado.

**Michigan Sub-Class:** All individuals who purchased or leased any Class Vehicle in the State of Michigan.

**Kansas Sub-Class:** All individuals who purchased or leased any Class Vehicle in the State of Kansas.

**New Jersey Sub-Class:** All individuals who purchased or leased any Class Vehicle in the State of New Jersey.

102.    Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns,

and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserves the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

103.   <u>Numerosity</u>: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

104.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Ford. The representative Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective engine and/or other damage components. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

105.   <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

    a.   Whether Class Vehicles suffer from defects relating to the engine;

    b.   Whether the defects relating to the engine constitute an unreasonable safety risk;

    c.   Whether Defendant knows about the defects pertaining to the engine and, if so, how long Defendant has known of the defect;

    d.   Whether the defective nature of the engine constitutes a material fact;

e.   Whether Defendant has a duty to disclose the defective nature of the engine to the Plaintiffs and Class Members;

f.   Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or permanent injunction;

g.   Whether Defendant knew or reasonably should have known of the defects pertaining to the engine before it sold and leased Class Vehicles to Class Members;

h.   Whether Defendant should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective engine;

i.   Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective engine;

j.   Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act; and

k.   Whether Defendant breached written warranties pursuant to the Magnuson-Moss Warranty Act.

106.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and they intend to prosecute this action vigorously.

107.   <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue

without remedy or relief.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

### FIRST CAUSE OF ACTION
**(Breach of Express Warranty)**
**(On Behalf of the Class and the Sub-Classes)**

108.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

109.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Sub-Classes.

110.    Ford is a "merchant" as defined under the Uniform Commercial Code (UCC).

111.    The Class Vehicles are "goods" as defined under the UCC.

112.    Ford provided a New Vehicle Limited Warranty that expressly warranted Ford would repair any defects in materials or workmanship free of charge during the applicable warranty periods.

113.    Plaintiffs and Class Members experienced the Engine Defect within the warranty period.

114.    Ford breached its warranty by failing to provide an adequate repair when Plaintiffs and the Class Members presented their Class Vehicles to authorized Ford dealers for repair of the Engine Defect.

115.    The warranty formed the basis of the bargain that was reached when Plaintiffs and Class Members purchased or leased their Class Vehicles.

116.    As a result of Ford's breach of its express warranty, Plaintiffs and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses for maintenance and service that they otherwise would not have incurred but for the Engine Defect.

117.    Plaintiffs and members of the Class have had sufficient direct dealings with either Ford or its agents (i.e., dealerships and technical support) to establish privity of contract between Ford, on one hand, and Plaintiffs and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

118.    Any attempt by Defendant to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because Defendant knowingly sold or leased defective products without informing consumers about the Engine Defect.  The time limits are unconscionable and inadequate to protect Plaintiffs and the members of the Class.  Among other things, Plaintiffs and members of the Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendant and unreasonable favored Defendant.  A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Engine Defect existed between Defendant and members of the Class.

119.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the members of the Class whole, because on information and belief, Defendant has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

120.    Plaintiffs and Class Members were not required to notify Ford of the breach or were not required to do so because affording Ford a reasonable opportunity to cute its breach of written warranty would have been futile.  Ford was also on notice of the Engine Defect from its own pre-

production testing, from the early complaints, service requests, and replacement part orders it received from its network of dealerships and Class Members, from repairs and/or replacements of the starter and other related system components under warranty, and from other internal sources, including communications and complaints from its network of dealerships.

121.    Plaintiffs and Class Members provided Ford with notice of the issues complained of herein within a reasonable time by presenting their Class Vehicles to authorized Ford dealers for repair of the Engine Defect.  Ford also received notice of the issues complained of herein by numerous complaints made directly to Ford and online, and from internal sources.

122.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Engines.

123.    Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of Ford's conduct described herein.

124.    In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Ford to limit its express warranty in a manner that would exclude or limit coverage for the Engine Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiffs and Class Members have presented their Class Vehicles to Ford's authorized dealers on numerous occasions and Ford has failed to remedy the Engine Defect.  As a result, Plaintiffs and Class Members are left with defective vehicles that pose a safety hazard and do not function as intended and, therefore, have been deprived of the benefit of their bargains.

125.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Ford to limit its express warranty in a manner that would exclude or limit coverage for the Engine Defect would be unconscionable. Ford's warranties were adhesive and did not permit negotiations. Ford possessed superior knowledge of the Engine Defect, which is a latent defect, prior to offering Class Vehicles for sale. Ford concealed and did not disclose the

Engine Defect, and Ford did not remedy the Engine Defect prior to sale (or afterward).

## SECOND CAUSE OF ACTION
**(Breach of Written Warranty under the Magnuson-Moss Warranty Act,
15 U.S.C. § 2303 *et seq*.)
(On Behalf of the Class and the Sub-Classes)**

126.     Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

127.     Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class and the Sub-Classes against Defendant.

128.     Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain. Accordingly, Defendant's express warranty is an express warranty under state law.

129.     The Engine and its component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

130.     In a section entitled "What's Covered," Defendant's express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

131.     According to Ford, "The Basic Limited Warranty lasts for 36 months from the date it begins or for 36,000 miles on the odometer, whichever occurs first."

132.     Defendant breached the express warranties by selling and leasing Class Vehicles with the Engine Defect, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the Engine and its component parts, and instead, replacing the defective Engine and its components with equally defective Engine and components. By simply replacing Plaintiffs' and Class Members' defective

Engine with similarly defective parts, Ford has failed to "repair" the defects as alleged herein.

133. Plaintiffs and the Class were not required to notify Ford of the breach or were excused from doing so because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile.

134. Plaintiffs and the Class provided Ford with notice of the issues complained of herein within a reasonable time by presenting their Class Vehicles to authorized Ford dealers for repair of the Engine defect. Ford also had notice of the issues complained of herein by numerous complaints made directly to Ford and online, and from internal sources.

135. Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Engine system.

136. As a direct and proximate cause of Defendant's breach, Plaintiffs and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

137. Plaintiffs and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### THIRD CAUSE OF ACTION
### Violation of (Breach of Implied Warranty of Merchantability)
### (On Behalf of the Class and Sub-Classes)

138. Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

139. Plaintiffs bring this cause of action on behalf of themselves and the members of the Class and the Sub-Classes.

140. Ford is a "merchant" as defined under the UCC.

141. The Class Vehicles are "goods" as defined under the UCC.

142. A warranty that the Class Vehicles were in merchantable quality and condition

arises by operation of law with respect to transactions for the purchase and lease of Class Vehicles. Defendant provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

143.    However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles suffered from the inherent Engine Defect at the time of sale and thereafter.

144.    Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

145.    Plaintiffs and the Class were not required to notify Ford of the breach or were excused from doing so because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile.

146.    Ford also had notice of the issues complained of herein by the presentation of Plaintiffs' Class Vehicles to authorized Ford dealers for repair of the Engine defect, numerous complaints made directly to Ford and online, and from internal sources.

147.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Engine system.

148.    Because Plaintiffs purchased their vehicles from authorized Ford dealers, Plaintiffs are in privity with Ford since an agency relationship establishes privity for purposes of the breach of implied warranty claims.  In addition, privity is not required because Plaintiffs are intended third-party beneficiaries of Defendant's implied warranties.

149.    As a result of Defendant's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

### FOURTH CAUSE OF ACTION
**(Breach of Implied Warranty under the Magnuson-Moss Warranty Act,
15 U.S.C. § 2303 *et seq.*)**

**(On Behalf of the Class and the Sub-Classes)**

150.    Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

151.    Plaintiffs bring this cause of action on behalf of themselves and the Class and the Sub-Classes against Defendant.

152.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

153.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

154.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

155.    Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their Engine were manufactured, supplied, distributed, and/or sold by Ford would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their Engine would be fit for their intended use while the Class Vehicles were being operated.

156.    Contrary to the applicable implied warranties, the Class Vehicles and their Engine at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles, their Engines, are defective.  Accordingly, the Class Vehicles are not fit for their intended use.

157.    Defendant's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

158.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000.00 (exclusive of interests and costs) computed based on all claims to be determined in this suit.

159.    Plaintiffs and the Class were not required to notify Ford of the breach or were

excused from doing so because affording Ford a reasonable opportunity to cure its breach have been futile.

160. Ford also had notice of the issues complained of herein by the presentation of Plaintiffs' Class Vehicles to authorized Ford dealers for repair of the Engine defect, numerous complaints made directly to Ford and online, and from internal sources.

161. Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Engine.

162. As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

163. As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

**FIFTH CAUSE OF ACTION**
**Violation of the Colorado Consumer Protection Act**
**(COLO. REV. STAT. §§ 6-1-101, *et seq*.)**
**(On behalf of the Colorado Sub-Class)**

164. Plaintiffs incorporate by reference the allegations in other paragraphs of this Complaint.

165. Plaintiff Robert Reed ("Colorado Plaintiff") brings this cause of action on their own behalf and on behalf of the members of the Colorado Sub-Class.

166. Ford is a "person" within the meaning of the Colorado Consumer Protection Act ("Colorado CPA"), COLO. REV. STAT. § 6-1-102.

167. The Colorado CPA prohibits a person from engaging in a "deceptive trade practice," including "knowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods […];" "represent[ing] that goods,

good, services, or property are of a particular standard, quality, or grade, […] if he knows or should know that they are of another;" and "advertis[ing] goods, services, or property with intent not to sell them as advertised." COLO. REV. STAT. § 6-1-105(1)(e), (g), and (i).

168.    Ford used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material facts in connection with consumer transactions involving the Class Vehicles, in violation of the Colorado CPA.

169.    Ford participated in unconscionable practices that violated the Colorado CPA as described below and alleged throughout the Complaint. By failing to disclose the Engine Defect, by concealing the Engine Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

170.    Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

171.    Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

172.    Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

173.    Ford knew or should have known that its conduct violated the Colorado CPA.

174.    Colorado Plaintiff and the Colorado Sub-Class Members reasonably relied on

Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

175.   Had Colorado Plaintiff and the Colorado Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

176.   Ford owed Colorado Plaintiff and the Colorado Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

(a) possessed exclusive knowledge of the design of the Class Vehicles and the Engine Defect;

(b) intentionally concealed the foregoing from Colorado Plaintiff and the Colorado Sub-Class Members; and/or

(c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Colorado Plaintiff and the Colorado Sub-Class Members that contradicted these representations.

177.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Colorado Plaintiff and the Colorado Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Colorado Plaintiff and the Colorado Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Colorado Plaintiff and the

Colorado Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Colorado Plaintiff and the Colorado Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

178.    Colorado Plaintiff and the Colorado Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

179.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, Colorado Plaintiff and the Colorado Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

180.    Defendant's violations present a continuing risk to Colorado Plaintiff and the Colorado Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

181.    As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Plaintiff and other members of the Colorado Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION
### Breach of Express Warranty
### (COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-210)
### (On behalf of the Colorado Sub-Class)

182.    Plaintiffs incorporate by reference and re-allege the allegations contained in other paragraphs of this Complaint.

183. Colorado Plaintiff brings this cause of action on their own behalf and on behalf of the members of the Colorado Sub-Class.

184. Ford is and was at all relevant times a "merchant" with respect to motor vehicles COLO. REV. STAT. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

185. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under COLO. REV. STAT. § 4-2.5-103(1)(p).

186. The Class Vehicles are and were at all relevant times "goods" within the meaning of COLO. REV. STAT. §§ 4-2-105(1) and 4-2.5-103(1)(h).

187. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

188. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

189. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

190. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

191. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel

drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

192. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

193. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

194. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

195. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Colorado Plaintiff and the Colorado Sub-Class Members.

196. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

197. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Colorado Plaintiff and the Colorado Sub-Class Members.

198. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

199. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Colorado Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

200. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

201.    Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

202.    The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Colorado Plaintiff and the Colorado Sub-Class Members. Among other things, Colorado Plaintiff and the Colorado Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

203.    Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

204.    Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

205.    Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

206.    Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

207.    As a direct and proximate cause of Ford's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including

economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

208.    As a direct and proximate result of Ford's breach of express warranties, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-212)**
**(On behalf of the Colorado Sub-Class)**

209.    Plaintiffs incorporate by reference and re-allege the allegations contained in the other paragraphs of this Complaint.

210.    Colorado Plaintiff brings this cause of action on their own behalf and on behalf of the members of the Colorado Sub-Class.

211.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under COLO. REV. STAT. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

212.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under COLO. REV. STAT. § 4-2.5-103(1)(p).

213.    The Class Vehicles are and were at all relevant times "goods" within the meaning of COLO. REV. STAT. §§ 4-2-105(1) and 4-2.5-103(1)(h).

214.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under COLO. REV. STAT. §§ 4-2-313 and 4-2.5-212.

215.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Colorado Plaintiff and the Colorado Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers

purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Colorado Plaintiff and the Colorado Sub-Class Members, with no modification to the defective engines.

216.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

217.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

218.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

219.   As a result of Ford's breach of the applicable implied warranties, Colorado Plaintiff and the Colorado Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

220.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of COLO. REV. STAT. §§ 4-2-313 and 4-2.5-212.

221.   Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said

obligations as a result of Ford's conduct described herein.

222.     Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

223.     As a direct and proximate cause of Ford's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

224.     As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
**(Violations of the Michigan Consumer Protection Law,
Mich. Comp. Laws § 445.903, *et seq.*)
(On Behalf of the Michigan Sub-Class)**

225.     Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

226.     Plaintiff Coppock brings this cause of action on behalf of herself and the Michigan Sub-Class.

227.     Plaintiff Coppock and the Michigan Sub-Class Members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

228.      Ford is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

229.     The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce,"

including: "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

230.    Ford participated in misleading, false, or deceptive acts that violated the Michigan CPA as described below and alleged throughout the Complaint. By promoting and selling or leasing Class Vehicles it knew were defective, failing to disclose the Engine  Defect, failing to make repairs or making repairs and providing replacements that caused Plaintiff Coppock and the Michigan Sub-class members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

231.    Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

232.    Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

233.    Ford knew that the Class Vehicles and their Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

234.    Ford knew or should have known that its conduct violated the Michigan CPA.

235.    Plaintiff Coppock and the Michigan Sub-Class Members reasonably relied on Ford's omissions of material facts when purchasing the Class Vehicles.

236.    Had Plaintiff Coppock and the Michigan Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

237.    Ford owed Plaintiff Coppock and the Michigan Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

    a.    Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' Engines;

    b.    Once Ford volunteered and made statements regarding the safety and reliability of the Class Vehicles, it was obligated to tell the whole truth about the safety and reliability of the Class Vehicles and their engines; and

    c.    Plaintiff Coppock and the Michigan Sub-class Members could not reasonably have been expected to learn or discover that their Engines had a dangerous safety defect until it manifested.

238.    Plaintiff Coppock and the Michigan Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Plaintiff Coppock and the Michigan Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

239.    As a result of Ford's conduct, Plaintiff Coppock and the Michigan Sub-Class Members were harmed and suffered actual damages as a result of Ford's omissions with regard to their Class Vehicles' Engines because they purchased vehicles which do not perform as advertised.

240.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiff Coppock and the Michigan Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

241.    Defendant's violations present a continuing risk to Plaintiff Coppock and the Michigan Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

242.    Plaintiff Coppock and the Michigan Sub-Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 each; and reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws.  Because Ford acted with willful and conscious disregard of the rights and safety of others, Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**NINTH CAUSE OF ACTION**
**Violation of the Kansas Consumer Protection Act**
**(KAN. STAT. ANN. § 50-623 *et seq*.)**
**(On behalf of the Kansas Sub-Class)**

243.    Plaintiffs incorporate by reference the allegations in other paragraphs of this Complaint.

244.    Plaintiffs Craig and Kelli Morford ("Kansas Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Kansas Sub-Class.

245.    Ford is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(1).

246.    Kansas Plaintiffs and the Kansas Sub-Class Members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

247.    The sale of the Class Vehicles to the Kansas Sub-Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

248.    The Kansas CPA states "[n]o supplier shall engaged in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowing making representations or with reason to know that the "property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities they do not have," "property or services are of a particular standard, quality, grade, style or model, if they are of another which differs materially from the representation," (2) "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact," and (3) "the willful failure to state a material fact, or the willful concealment,

suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplies shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

249. Ford used or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material facts in connection with consumer transactions involving the Class Vehicles, in violation of the Kansas CPA.

250. Ford participated in unconscionable practices that violated the Kansas CPA as described below and alleged throughout the Complaint. By failing to disclose the Engine Defect, by concealing the Engine Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

251. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

252. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

253. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

254. Ford knew or should have known that its conduct violated the Kansas CPA.

255. Kansas Plaintiffs and the Kansas Sub-Class Members reasonably relied on Ford's

misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

256.    Had Kansas Plaintiffs and the Kansas Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

257.    Ford owed Kansas Plaintiffs and the Kansas Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

        (a) possessed exclusive knowledge of the design of the Class Vehicles and the Engine Defect;

        (b) intentionally concealed the foregoing from Kansas Plaintiffs and the Kansas Sub-Class Members; and/or

        (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Kansas Plaintiffs and the Kansas Sub-Class Members that contradicted these representations.

258.    Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Kansas Plaintiffs and the Kansas Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Kansas Plaintiffs and the Kansas Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Kansas Plaintiffs and the

Kansas Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Kansas Plaintiffs and the Kansas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

259.    Kansas Plaintiffs and the Kansas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Kansas Plaintiffs and the Kansas Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

260.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, Kansas Plaintiffs and the Kansas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

261.    Defendant's violations present a continuing risk to Kansas Plaintiffs and the Kansas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

262.    Pursuant to Kan. Stat. Ann. § 50634, Kansas Plaintiffs and the Kansas Sub-Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Kansas Plaintiffs and each Kansas Sub-Class member.

263.    Kansas Plaintiffs also seek an order enjoining Ford's unfair, unlawful, deceptive, and/or unconscionable practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq*.

**TENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(KAN. STAT.§§ 84-2-313 and 84-2A-210)**
**(On behalf of the Kansas Sub-Class)**

264.    Plaintiffs incorporate by reference and re-allege the allegations contained in other

paragraphs of this Complaint.

265.    Kansas Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Kansas Sub-Class.

266.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

267.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

268.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. § 84-2-105(1) and Kan. § 84-2A-103(1)(h).

269.    Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

270.    Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

271.    Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

272.    Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

273.    Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve

covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

274.    For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

275.    Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

276.    Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

277.    The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Kansas Plaintiffs and the Kansas Sub-Class Members.

278.    Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

279.    Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Kansas Plaintiffs and the Kansas Sub-Class Members.

280.    Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

281.    Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Kansas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the  engines with equally defective components, without actually repairing the Class Vehicles.

282.    Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any

attempt on its part to disclaim liability for its actions.

283.     Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

284.     The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Kansas Plaintiffs and the Kansas Sub-Class Members. Among other things, Kansas Plaintiffs and the Kansas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

285.     Kansas Plaintiffs and the Kansas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

286.     Kansas Plaintiffs and the Kansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

287.     Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

288.     Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

289.     As a direct and proximate cause of Ford's breach, Kansas Plaintiffs and the Kansas

Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kansas Plaintiffs and the Kansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

290.    As a direct and proximate result of Ford's breach of express warranties, Kansas Plaintiffs and the Kansas Sub-Class Members have been damaged in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability
### (KAN. STAT. §§ 84-2-314 and 84-2A-212)
### (On behalf of the Kansas Sub-Class)

291.    Plaintiffs incorporate by reference and re-allege the allegations contained in the other paragraphs of this Complaint.

292.    Kansas Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Kansas Sub-Class.

293.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. § 84-2-104(1), and a "seller" of motor vehicles under § 84-2-103(1)(d).

294.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

295.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. § 84-2-105(1) and Kan. Stat. § 84-2A-103(1)(h).

296.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Kan. Stat. § 84-2-314 and Kan. Stat. § 84-2A-212.

297.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Kansas Plaintiffs and the Kansas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers

purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Kansas Plaintiffs and the Kansas Sub-Class Members, with no modification to the defective engines.

298.    Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

299.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

300.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

301.    As a result of Ford's breach of the applicable implied warranties, Kansas Plaintiffs and the Kansas Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Kansas Plaintiffs and the Kansas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

302.    Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Kan. Stat. § 84-2-314 and Kan. Stat. § 84-2A-212.

303.    Kansas Plaintiffs and the Kansas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said

obligations as a result of Ford's conduct described herein.

304.    Kansas Plaintiffs and the Kansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

305.    As a direct and proximate cause of Ford's breach, Kansas Plaintiffs and the Kansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kansas Plaintiffs and the Kansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

306.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Kansas Plaintiffs and the Kansas Sub-Class Members have been damaged in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**
**Violation of the New Jersey Consumer Fraud Act**
**(N.J. Stat. Ann. §§ 56:8-1, et seq.)**
**(On behalf of the New Jersey Sub-Class)**

307.    Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

308.    Plaintiff David Schiavi ("New Jersey Plaintiff") bring this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

309.    Ford, New Jersey Plaintiff, and the New Jersey Sub-Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

310.    Ford engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

311.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person

of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. Ford engaged in unconscionable commercial practice or deceptive acts or practices that violated the New Jersey CFA as described above and below and did so with the intent that Plaintiffs rely upon their acts of concealment, suppression and/or omission.

312.    Ford participated in unfair or deceptive trade practices that violated the New Jersey CFA, including by failing to disclose the Engine Defect, by concealing the Engine Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

313.    Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

314.    Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

315.    Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

316.    Ford knew or should have known that its conduct violated the New Jersey CFA.

317.    New Jersey Plaintiff and the New Jersey Sub-Class Members reasonably relied on

Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

318.     Had New Jersey Plaintiff and the New Jersey Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

319.     Ford owed New Jersey Plaintiff and the New Jersey Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford: (a) possessed exclusive knowledge of the design of the Class Vehicles and the Engine Defect; (b) intentionally concealed the foregoing from New Jersey Plaintiff and the New Jersey Sub-Class Members; and/or (c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New Jersey Plaintiff and the New Jersey Sub-Class Members that contradicted these representations.

320.     Due to Ford's specific and superior knowledge that the engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New Jersey Plaintiff and the New Jersey Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the engines will cause failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the engines will cause damage to Class Vehicle engines, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to New Jersey Plaintiff and the New Jersey Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by New Jersey Plaintiff and the New Jersey Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford truck consumers. Ford represented to New Jersey Plaintiff and the New Jersey Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high

quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

321.    New Jersey Plaintiff and the New Jersey Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, New Jersey Plaintiff and the New Jersey Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

322.    As a result of Ford's conduct, New Jersey Plaintiff and the New Jersey Sub-Class Members were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

323.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

324.    Defendant's violations present a continuing risk to New Jersey Plaintiff and the New Jersey Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

325.    Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiff and the New Jersey Sub-Class Members seek an order enjoining Ford's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA

## THIRTEENTH CAUSE OF ACTION
### Breach of Express Warranty
### (N.J. Stat. Ann. §§ 12A:2-313 and 2A-210)
### (On behalf of the New Jersey Sub-Class)

326.    Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

327.    New Jersey Plaintiff bring this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

328.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

329.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

330.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

331.    Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

332.    Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

333.    Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

334.    Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

335.    Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

336.     For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

337.     Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

338.     Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

339.     The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to New Jersey Plaintiff and the New Jersey Sub-Class Members.

340.     Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

341.     Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by New Jersey Plaintiff and the New Jersey Sub-Class Members.

342.     Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

343.     Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed New Jersey Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

344.     Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

345.     Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

346.    The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect New Jersey Plaintiff and the New Jersey Sub-Class Members. Among other things, New Jersey Plaintiff and the New Jersey Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

347.    New Jersey Plaintiff and the New Jersey Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

348.    New Jersey Plaintiff and the New Jersey Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

349.    Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

350.    Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

351.    As a direct and proximate cause of Ford's breach, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and the New Jersey Sub-Class Members have incurred or will incur economic

damages at the point of repair in the form of the cost of repair.

352.    As a direct and proximate result of Ford's breach of express warranties, New Jersey Plaintiff and the New Jersey Sub-Class Members have been damaged in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability
### (N.J. Stat. Ann. §§ 12A:2-314 and 2A-212)
### (On behalf of the New Jersey Sub-Class)

353.    Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

354.    New Jersey Plaintiff bring this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

355.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

356.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

357.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

358.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

359.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom New Jersey Plaintiff and the New Jersey Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiff and the New Jersey Sub-Class Members, with no modification to the defective engines.

360.     Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

361.     This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

362.     Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

363.     As a result of Ford's breach of the applicable implied warranties, New Jersey Plaintiff and the New Jersey Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, New Jersey Plaintiff and the New Jersey Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

364.     Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

365.     New Jersey Plaintiff and the New Jersey Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

366.     New Jersey Plaintiff and the New Jersey Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of

written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

367.    As a direct and proximate cause of Ford's breach, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and the New Jersey Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

368.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, New Jersey Plaintiff and the New Jersey Sub-Class Members have been damaged in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION
**(Fraudulent Concealment and/or Fraud in the Inducement)**
**(On Behalf of the Class and the Sub-Classes)**

369.    Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

370.    Plaintiffs bring this cause of action on behalf of themselves and the Class and the Sub-Classes against Defendant.

371.    Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts concerning the standard, quality or grade of the Class Vehicles, the presence of the Engine Defect installed in the Class Vehicles, and the risk to the safety and reliability of the Class Vehicles due to the Engine Defect.

372.    Defendant's intentional and knowing concealment, suppression and/or omission of these material facts was done with the intent that Plaintiffs and Class Members would rely on Defendant's omissions.

373.    As a direct result of Defendant's fraudulent conduct, Class Members have suffered actual damages.

374.    Defendant knew (including at the time of sale or lease and thereafter) that the

Class Vehicles contained the Engine Defect, but Defendant concealed the Defect and never intended to repair or replace the Defect during the warranty period.  To date, Defendant has not provided Plaintiffs or Class Members with a repair or remedy that will eliminate the Defect.

375.    Defendant owed a duty to disclose the Defect and its corresponding safety hazard to Plaintiffs and Class Members because Defendant possessed superior and exclusive knowledge regarding the Defect.  Rather than disclose the Defect, Defendant intentionally and knowingly concealed, suppressed and/or omitted material facts concerning the Defect so that Defendant could sell additional Class Vehicles and avoid the cost of repair or replacement.

376.    The Defect exposes drivers and occupants to an unreliable vehicle with a safety defect. Plaintiffs and Class Members had a reasonable expectation that the vehicles would not expose them and other vehicle occupants to such a safety hazard.  No reasonable consumer expects a vehicle to be designed, manufactured and assembled with an Engine in the Class Vehicles which leaks coolant into the engine cylinder causing overheating and catastrophic failure.

377.    Plaintiffs and Class Members would not have purchased or leased the Class Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Defect, or would have paid less for the Class Vehicles.

378.    Defendant knew its concealment and suppression of material facts were false and misleading and knew the effect of concealing those material facts.  Defendant knew its concealment and suppression of the Defect would enable it to sell more Class Vehicles and would discourage Plaintiffs and Class Members from seeking replacement or repair of the Defect.  Further, Defendant intended to induce Plaintiffs and Class Members into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Defect, to decrease costs and increase profits.

379.    Defendant acted with malice, oppression and fraud.

380.    Plaintiffs and Class Members reasonably relied upon Defendant's knowing

concealment and omissions.  As a direct and proximate result of Defendant's omissions and active concealment of material facts regarding the Defect and associated safety hazard, Plaintiffs and Class Members have suffered actual damages in an amount to be determined at trial.

### SIXTEENTH CAUSE OF ACTION
#### (Negligent Misrepresentation)
#### (On Behalf of the Class and the Sub-Classes)

381.    Plaintiffs incorporate by reference the allegations contained in the other paragraphs of this Complaint.

382.    Plaintiffs bring this cause of action on behalf of themselves and the Class and the Sub-Classes against Defendant.

383.    Defendant owed a duty to disclose the Engine Defect and its corresponding safety hazard to Plaintiffs and Class Members because Defendant possessed superior and exclusive knowledge regarding the Defect and the associated risks.

384.    Defendant negligently omitted material facts concerning the Defect in the Class Vehicles. As a direct result of Defendant's negligent conduct, Class Members have suffered actual damages.

385.    The Defect is material because Plaintiffs and Class Members had a reasonable expectation that the vehicles would not suffer from a defect that would expose drivers and occupants to dangerous safety issues and an unreliable vehicle.  No reasonable consumer expects a vehicle to present a defect that exposes drivers and occupants to such a safety hazard.

386.    Plaintiffs and Class Members would not have purchased the Class Vehicles but for Defendant's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Defect, or would have paid less for the Class Vehicles. Plaintiffs and Class Members justifiably relied upon Defendant's negligent omissions of material facts.

387.    As a direct and proximate result of Defendant's negligent omissions of material facts regarding the standard, quality or grade of the Class Vehicles and/or the presence of the Defect, Plaintiffs and Class Members have suffered an ascertainable loss and actual damages in

an amount to be determined at trial.

**SEVENTEENTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

388.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

389.    Plaintiffs bring this cause of action on behalf of themselves and the Class, or alternatively on behalf of the Sub-Classes.

390.    As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

391.    As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Defendant charged a higher price for their vehicles than the vehicles' true value. Plaintiffs and members of the Class paid that higher price for their vehicles to Defendant's authorized dealers, which are in Defendant's control. Defendant also reaps huge profits from the sales of its vehicles through its authorized dealers, having generated revenue totaling $98,053,000 in 2019 alone.

392.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

393.    Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiff and Class Members.

394.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

## PRAYER FOR RELIEF

395.    Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a)    An order certifying the proposed Class, designating Plaintiffs as named representatives of the Classes, and designating the undersigned as Class Counsel;

(b)    A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the engine, including the need for periodic maintenance;

(c)    An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to remove, repair, and/or replace the Class Vehicles' defective engine with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d)    An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e)    Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f)    Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

(g)    A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its

Class Vehicles or make full restitution to Plaintiffs and Class Members;

(h)    An award of attorneys' fees and costs, as allowed by law;

(i)    An award of pre-judgment and post-judgment interest, as provided by law;

(j)    Leave to amend the Complaint to conform to the evidence produced at trial; and

(k)    Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

396.    Plaintiffs hereby demand a trial by jury of all issues in this action so triable.

Dated:  November 30, 2020    Respectfully submitted,

Attorneys for Plaintiff,

By: */s/ Russell D. Paul*
Russell D. Paul (Bar No. 4647)
Abigail Gertner (PHV app. forthcoming)
Amey J. Park (PHV app. forthcoming)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:    (215) 875-3000
Fax:    (215) 875-4604
Email:  rpaul@bm.net
           agertner@bm.net
           apark@bm.net

**CAPSTONE LAW APC**
Steven R. Weinmann (PHV app. forthcoming)
Tarek H. Zohdy (PHV app. forthcoming)
Cody R. Padgett (PHV app. forthcoming)
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:    (310) 556-4811
Facsimile:    (310) 943-0396
Steven.Weinmann@capstonelawyers.com
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com